

**ORDERED in the Southern District of Florida on April 29, 2021.**

_____
**Mindy A. Mora, Judge**
**United States Bankruptcy Court**

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Case No.: 19-20400-MAM |
| Villas of Windmill Point II Property Owners Association, | Chapter 11 |
| Debtor. _____/ | |
| Les S. Osborne, | Adv. Proc. No.: 19-01822-MAM |
| Plaintiff, v. | |
| Thomas Lesko and The Kingdom Trust Company, | |
| Defendants. _____/ | |

### MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

About forty years ago, the board of directors of a property owners' association

adopted a set of bylaws ("Bylaws"). Like most corporate governance documents, the

Bylaws required the officers and directors to act in the best interests of the association and all of the associations' members. Somewhere along the way, the directors lost their sense of purpose. A few began twisting the provisions of the Bylaws to serve their own ends, ignoring the premise upon which the original documents were drafted: the collective good of all resident members of the association.

And that is how the association ended up as a debtor in this Court.

## BACKGROUND

On August 2, 2019 ("Petition Date"), Villas of Windmill Point II Property Owners Association, Inc. ("Debtor") filed a chapter 11 petition for bankruptcy relief. From the first week of the Bankruptcy Case, it became clear to the Court that Debtor's financial distress stemmed from some sort of shenanigans that had culminated in entry of a state court receivership order ("Receivership Order")[1] entered on the Petition Date.

Within days of the Petition Date, the United States Trustee filed an emergency motion to either dismiss the case or appoint a chapter 11 trustee. Operating on emerging facts and strong intuition, the Court determined that Debtor's financial stress was severe and that appointment of a chapter 11 trustee was the likeliest path to a successful reorganization.

As the Bankruptcy Case unfolded, the scope of prepetition bad acts began to emerge. The entire condominium complex was in substantial disrepair. The majority

---

[1] ECF No. 44, p. 115 (*Order on Motion to Appoint Receiver*).

of units were owned by Debtor, not individual residents, for reasons that were not immediately clear. A few directors held a shockingly high number of mortgages on units. Taxes were unpaid. Books and records were incomplete or missing. The list went on.

Now, almost a year and half since Debtor first appeared in this Court seeking relief, the picture is much rosier for Debtor's residents. The court-appointed trustee, Les Osborne ("Trustee"), working with court-approved management companies,[2] has largely completed the massive project of righting the ship. Maintenance services have recommenced and are no longer critical. Roofs and roads are being repaired. Taxes have been paid.

All of these developments were made possible, in part, by the sale ("Sale") of 53 Debtor-owned units to Eric Nathanson for $4,450.000. The Sale, which was subject to all of the procedural safeguards available in any bankruptcy case,[3] resulted in a desperately-needed cash infusion that transformed Debtor into a functioning entity capable of submitting a chapter 11 plan. Although approval of Debtor's current plan is by no means certain, the present posture of Debtor and its residents is one in which

---

[2] The St. Lucie County Court ("State Court") entered the Receivership Order on the same day that Debtor filed for bankruptcy relief. The Receivership Order appointed Suzie Butler as Receiver for the Debtor. On October 10, 2019, upon proper motion by the Trustee and after notice to all parties, this Court entered an order (ECF No. 91) approving the engagement of the Receiver's management company, Coastal Community Association Service, Inc. ("Coastal"). On April 29, 2020, the Court entered a subsequent order approving the retention of Oxygen Management Services, LLC in place of Coastal.

[3] ECF No. 198 in Case No. 19-20400 ("Sale Order").

approval of a plan is at least a reasonable prospect. That alone is noteworthy in this Bankruptcy Case.

This success, however, is not without its pitfalls. Now that Debtor has relatively full coffers and the potential for a successful reorganization, three of Debtor's former officers and directors are seeking payment through Debtor's plan for substantial claims. One of those directors, Thomas Lesko ("Lesko"), is a defendant in this Adversary Proceeding.[4]

PROCEDURAL HISTORY

In response to Lesko's proof of claim filed as Claim No. 19 (the "Lesko Claim"), Trustee instituted this Adversary Proceeding seeking, among other things,[5] a judgment establishing the invalidity of that claim. Two months after filing his Amended Complaint (ECF No. 44), Trustee quickly moved for summary judgment (ECF No. 59) ("Trustee's Motion") on two counts: objection to claim and constructive fraudulent transfer.[6]

---

[4] The other defendant, The Kingdom Trust Company ("Kingdom Trust"), is an investment vehicle for Lesko. The Court knows surprisingly little about this defendant, including whether it was Trustee's intention to seek summary judgment against Kingdom Trust. The Amended Complaint (ECF No. 59) does not specify against whom each claim is sought, nor does the motion for summary judgment clarify that point. For Kingdom Trust's part, Lesko's response merely provides in a footnote that Kingdom Trust issues are to be addressed at "another time".

[5] The Adversary Proceeding asserts ten other causes of action, including breach of fiduciary duty, negligence, conversion, avoidance of fraudulent transfer, avoidance and recovery of preferential transfers, and determination of the extent, validity, and priority of liens.

[6] Trustee's Motion mistakenly identifies the two counts upon which summary judgment is sought as Counts I and IV. Count IV is a count for conversion. The arguments in Trustee's Motion, however, all pertain to fraudulent transfer. The Court presumes that Trustee intended to seek summary judgment as to Counts I and VII.

Lesko countered by filing a document styled as both a response and counter-motion for summary judgment (ECF Nos. 72 and 85) ("Counter-Motion") on all counts. The Court solicited briefing on both Trustee's Motion and the Counter-Motion. The parties complied with the briefing orders by filing a whopping 1500 pages of documents, most of which were compiled without the benefit of pdf "bookmarks" or indexing.[7]

In addition, the parties filed two 20-page joint stipulations (ECF Nos. 101 and 114) (collectively, the "Joint Stipulation") that were identical except for a handful of scattered paragraphs.[8] Although most citations were thoughtfully noted in the Joint Stipulation, the vast majority of these citations could not be tracked to the record.[9] The parties also supplied the Court with trial exhibits and corresponding motions in limine that collectively numbered in the hundreds of pages.[10]

---

[7] Hundreds of pages of these documents were either minimally relevant or wholly irrelevant to the issues actually being litigated. To further complicate the Court's analysis, many of the more pertinent documents were not filed *with* Trustee's Motion or the Counter-Motion. Instead, the parties apparently filed the documents as they became available (or perhaps when the parties realized their usefulness). Lesko recently filed another 96 pages of potential exhibits and exhibit registers. *See* ECF Nos. 129, 130, 131, 132, & 133. Because Lesko's most recent submissions were filed at least six months after the deadline(s) for submissions established via court order, the Court declines to consider them at this time. *See* ECF Nos. 63, 86, 116.

[8] The insertion of a few paragraphs resulted in unmatched numbering between the two documents. Because the undisputed facts were virtually the same, a more streamlined method of complying with the Court's briefing orders would have been to adopt the prior stipulation and clearly identify the new paragraphs added in the second stipulation. The parties also failed to sign ECF No. 114.

[9] The reasons for this confusion appear to be twofold: (1) simple error, likely through the drafter's reference to a source document with different pagination, and (2) an indecipherable form of exhibit numbering that probably relates to filings previously submitted to the State Court. The Court feels obliged to note at this point that careful proofing by the filing attorneys (not merely the drafter) would have eliminated all erroneous references and spared the Court a great deal of frustration.

[10] Issues relating to admissibility of those documents at trial has been reserved for the trial stage of this Adversary Proceeding.

The Court must explain that this Adversary Proceeding is but one of three interrelated adversary proceedings involving two other directors of Debtor and family members of those directors. Despite the uniqueness of each adversary proceeding, the parties have largely treated this Adversary Proceeding (involving Lesko) as the functional "lead" Adversary Proceeding, adopting and referring to pleadings within this proceeding.[11]

The end result is a disorganized and voluminous record. Trustee's Motion, for example, contains 19 pages of "undisputed" factual allegations that predate the Joint Stipulation(s) and therefore cannot be easily reconciled with them. Key deposition testimony is found in numerous exhibits to Trustee's response to the Counter-Motion, but is not attached to Trustee's Motion itself.[12] The Court spent an inordinate amount of time endeavoring to make sense of the record and ascertain precisely *which* documents and *what* facts are relevant to Trustee's Motion and the Counter-Motion.

Having finally accomplished that task, the Court now issues this Memorandum Opinion and Order.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056, the Court shall grant summary judgment "if the movant shows that there is no genuine dispute

---

[11] *See, e.g.*, Adv. Proc. No. 19-1874, ECF No. 52.

[12] ECF No. 101, Exhibits 1-12. Lesko amassed exhibits in support of summary judgment into one 239-page document with multiple cryptic exhibit stickers that do not match the references in the Counter-Motion. ECF No. 87-1.

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When deciding summary judgment, the Court may look to materials in the record such as depositions, documents, affidavits or declarations, and admissions." *Certain Interested Underwriters at Lloyd's, London v. AXA Equitable Life Ins. Co.*, 981 F. Supp. 2d 1302, 1305-06 (S.D. Fla. 2013) (citing Fed. R. Civ. P. 56(c)).

The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Diaz v. Amerijet Int'l, Inc.*, 872 F. Supp. 2d 1365, 1368 (S.D. Fla. 2012) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)) (internal quotation marks omitted); *see also Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013). Finally, the moving party "always bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *see also Josendis v. Wall to Wall Residence Repairs, Inc.,* 662 F.3d 1292, 1314-15 (11th Cir. 2011).

## ANALYSIS

### I.    Count I – Objection to Proof of Claim

Lesko's claim asserts four (really three) potential bases for Debtor's supposed obligation: (i) wages totaling $208,500 ("Wage Claim"), (ii) performance bonuses and

commissions totaling $124,492.32 ("Bonus Claim"), (iii) a severance award and late charges totaling $1,566,590.80 ("Severance Claim"), and (iv) delinquencies of $46,083.12 arising from mortgages relating to the Severance Claim ("Delinquency Claim"). The cumulative amount asserted in the Lesko Claim as of the Petition Date is $1,945,666.24.[13]

Although each of the four bases for the Lesko Claim could theoretically require extensive analysis, unpacking the merits of the entire Lesko Claim is quite simple for one reason: every act taken by the Board of Directors supporting the purported obligation was, according to Debtor's Bylaws, an *ultra vires* act. And, to the extent that Lesko might assert that his actions were approved and payment authorized by a 2005 consulting agreement between Lesko Consulting and Debtor (as later amended, the "Consulting Agreement"), the Court need only point out that the engagement of Lesko Consulting (even if valid) did not make Lesko an "employee" of Debtor.

The Court will address the Wage Claim, the Bonus Claim, the Severance Claim, and the Delinquency Claim in turn.

A.  Wage Claim

The Wage Claim asserts amounts due for services by Lesko from November 27, 2016 to the Petition Date. Lesko contends that during this time, he provided services under the Consulting Agreement entitling him to $150/hour for up to ten hours per

---

[13] The Court affords no weight to Lesko's characterization of the entire amount as a wage or severance claim under 11 U.S.C. § 507(a)(4)(A) because Lesko was never an employee of Debtor.

week. He extrapolates those amounts to conclude that he is due for 2 years and 35 weeks of services billed at an amount of $1500/week, or $208,500.

The Court will make a few observations that show the imprecision and inconsistency in Lesko's arguments in support of the Wage Claim. For this purpose, the Court will assume *arguendo* that the Consulting Agreement was validly adopted (a point the Court does not believe to be true).

First, Lesko's asserted hours include time for which he was administratively adjudicated to be disabled and therefore unable to work. Lesko submitted sworn statements in support of this determination.[14] Lesko also stipulated that he was disabled as of Thanksgiving Day 2016, which was November 24, 2016. After that date, Lesko was unable to work and only volunteered for Debtor, without any compensation because he was unable to perform his services as he used to do.[15]

Second, the original Consulting Agreement only provided for services totaling $600 per week, not $1500.[16] A November 17, 2005 addendum ("Addendum") increased the hourly amount to $125 but stipulated that Lesko would be "limited to bill for only 6 hours per week".[17] That would equate to $750 per week, not $1500. Neither the Lesko Claim nor the Counter-Motion clarify how the maximum weekly contract rate

---

[14] ECF No. 61-4, p. 34-41; ECF No. 61-9, p. 6, ¶¶ 25-28.

[15] ECF No. 101, p. 8-9.

[16] ECF No. 61-4, p. 29. Many of the documents in the record are composite exhibits with multiple "exhibit" stickers, header pages, or footer references. Those identifying marks usually do not correlate with the references in the pleadings. For ease of reference, page numbers throughout this Opinion refer to the PDF page numbers of the documents as accessed via the Court's docket on CM/ECF.

[17] ECF No. 87-1, p. 24.

doubled to $1500 per week, and the Court was unable to locate documentary support for that rate within the record.[18]

Third, Lesko's computations do not reflect any reductions in billed hours for holidays, vacations, or, significantly, his own incarceration.[19]

Fourth, the purported "work" performed by Lesko was in the nature of CAM services for which Lesko did not have a license. Although Lesko contends that he specifically did not perform CAM services, the record demonstrates otherwise.[20]

Fifth, Lesko was not Debtor's direct employee. This rather obvious statement bears repeating because Lesko has characterized the Wage Claim as precisely that: a claim for wages under 11 U.S.C. § 507(a)(4)(A).

In numerous documents submitted to the Court, Lesko has characterized himself as a "volunteer" director of Debtor. The Consulting Agreement shows that Villas engaged Lesko in his capacity as president of Lesko's business entity, Lesko Consulting. The Consulting Agreement appears to have been drafted by a non-lawyer and therefore lacks many of the traditional formalities observed in an arms-length agreement. Despite these failings, the Consulting Agreement indicates that Debtor engaged Lesko Consulting (and therefore Lesko) as an independent contractor. There is nothing in the record to suggest that Debtor withheld federal and state taxes, subsidized health benefits, or otherwise hired Lesko as an employee.

---

[18] The record spans over a thousand pages. No citation to support the higher amount was provided to the Court and the Court was unable to independently verify the asserted amount.

[19] ECF No. 61-9, p. 6, ¶ 29.

[20] ECF No. 61-4, pp. 3-5, ¶¶ 9-24.

For all of these reasons, the Wage Claim fails as a claim under 11 U.S.C. § 507(a)(4)(A) and must be valued at zero. Trustee's objection to the Wage Claim is sustained.

The Court will address supplemental reasons why the Wage Claim must fail in its analysis of the remaining claims.

B. <u>Bonus Claim</u>

Lesko's Bonus Claim also derives from the Consulting Agreement. Although Lesko's proof of claim is non-specific as to the precise language purportedly giving rise to the Bonus Claim, he asserts that his "consulting contracts" provided for a 35% performance bonus and commission for monies acquired by Debtor as a result of Lesko's actions.

The Addendum generally supports Lesko's contention that the Consulting Agreement contemplated performance "bonuses", but Lesko overstates the allowable percentage under the Addendum and likewise overlooks the foundation upon which any "bonus" might have been paid.[21] The first flaw is admittedly minor; the second failing, however, is fatal, particularly when the Consulting Agreement is interpreted in accordance with the Bylaws.

The Consulting Agreement lists several instances in which a performance "bonus" might be paid to Lesko Consulting (and therefore Lesko). Those instances

---

[21] ECF No. 87-1, p. 24, fourth paragraph ("Consultant's commission and performance bonus will … be based … at the continued rate of 33 1/3%.") Despite characterizing the applicable percentage as "continued", the Addendum slightly raises the amount set forth in the original Consulting Agreement (33%).

include situations like recovery of overpayment by Debtor to vendors, refunds from vendors who performed unsatisfactory work for Debtor, and elimination or forgiveness of debt by vendors. None of these situations is per se problematic.

The Consulting Agreement goes on, however, to include cryptic references to "expediting fees", "document fees", "interview fees", and "fines & penalties".[22] The Court believes that the average homeowner might very well not realize that the impact of these provisions would be to incentivize Lesko to line his own pockets with mysterious "fines" and "penalties" collected from unwitting homeowners—which is apparently precisely what occurred.[23]

The reality of what happened is in large part why the Bonus Claim must fail. Lesko and other directors used their positions to terrorize residents and capitalize upon their positions of power. The record, when viewed as a whole, leaves no room for doubt that Lesko abused his power as a "volunteer" director.[24]

The record reflects that Debtor transferred astronomical sums to Lesko, entities under Lesko's control, and family members of Lesko over the ten-year period preceding the Petition Date.[25] The record also reflects that, during this time, Lesko

---

[22] ECF No. 61-4, p. 29, third paragraph.

[23] *See, e.g.*, ECF No. 105-2, p. 2, ¶¶ 9-12. .

[24] ECF No. 44, p. 116, ¶ 4. ("[T]he board of directors continues to conduct the affairs of the HOA pursuant to its nefarious business model that only promotes fraud, self-dealing and waste of the HOA's assets and the assets of its members.")

[25] ECF No. 100-1, p.2.

and other directors imposed outrageous "fines" upon residents for mundane acts like walking a dog.[26]

Books and records describing the Debtor's financial dealings over the course of many of the years in question have mysteriously disappeared, ostensibly due to Hurricane Irma. As a result, it is impossible to track exactly how much of Debtor's income was attributable to normal sources, like maintenance fees, and how much derived from more nefarious sources. Despite this difficulty, there is ample evidence in the record to indicate that Lesko and other directors hustled resident members of Debtor by assessing trumped-up fees and blocking any normal avenue of inquiry.[27]

Prepetition transfers totaling in the hundreds of thousands of dollars were paid by Debtor to Lesko prior to November 2016. The amounts now sought in the Lesko Claim are *in excess of* those amounts. Although all amounts asserted in the Lesko Claim are invalid, it is the Bonus Claim that most clearly shows the detrimental impact of Lesko's actions upon the members of Debtor.

The "bonus" structure crafted by Lesko and enforced by Debtor's directors rewarded Lesko and other actors, including Steven Goldfarb and McDonald Storey "<u>Storey</u>"), for acts that ventured into thuggery.[28] Deposition testimony reveals that

---

[26] ECF No. 105-2, p.2, ¶ 9.

[27] ECF No. 105-2, p. 2, ¶¶ 9-12.

[28] Goldfarb and Storey each received compensation as a result of Lesko's unlawful acts and thus were incentivized to aid Lesko.

directors imposed fines and penalties to extort compliance from Debtor's members who sought to fight back via standard provisions of Florida Statutes and the Bylaws.[29]

More distressing, sworn testimony from Debtor's prior members includes allegations of directors victimizing residents by breaking into homes, refusing to permit rentals, threatening to poison pets, and promising bodily harm.[30] These tactics were the means by which Lesko "recovered" funds for Debtor under the auspices of the Consulting Agreement. It is upon those "recovered" funds that Lesko now bases his Bonus Claim.

For obvious reasons, this Court cannot condone Lesko's actions. The State Court reached an identical conclusion in the Receivership Order.[31] Even if the Court could consider itself free to ignore the State Court's findings because the Receivership Action was solely against Debtor, not Debtor's directors, the Court is strongly persuaded that the record in *this* action provides abundant proof of prepetition misdeeds by Lesko.[32] Those misdeeds eviscerate any potential claim for "services" rendered pursuant to the Consulting Agreement, including prospective entitlement to "bonuses" procured through harm to Debtor and Debtor's resident members.

All of these facts support the Court's conclusion that Lesko's Bonus Claim must fail for equitable reasons alone, and must be valued at zero. The Bonus Claim also is

---

[29] ECF NO. 105-1, p.2, ¶¶ 6- 9.

[30] *See generally* ECF Nos. 61-6; 61-7; 105-2; and 105-5.

[31] ECF No. 44, p. 116, ¶ 4.

[32] The record in this action also provides ample proof of misdeeds by Goldfarb and Storey.

invalid because it, like the Wage Claim, Severance Claim, and Delinquency Claim, was the product of *ultra vires* acts by Lesko and other directors. The Court will elaborate further upon that point below.

For these reasons, Trustee's objection to the Bonus Claim is sustained.

C. <u>Severance Claim</u>

Lesko bases his Severance Claim upon a resolution dated March 1, 2019 (the "<u>2019 Resolution</u>"). In a prior opinion in Debtor's Bankruptcy Case, the Court assessed the probable validity of the 2019 Resolution and found it highly lacking.[33] As the Court's analysis of the record has expanded to include issues asserted in this Adversary Proceeding, the Court's initial concern over the circumstances under which Debtor's directors adopted the 2019 Resolution has grown exponentially.

Deposition testimony from several members of Debtor paints a picture of dictatorial rule in early 2019. The declarations submitted by Debtor's prior members are disturbing. Even without this testimony, however, the Court cannot accept the 2019 Resolution at face value for numerous reasons, many of which have already been discussed at length in the Indemnity Opinion. The Court will address a few of the more compelling reasons now.[34]

First, Debtor's debt load exceeded allowable limitations under Debtor's Bylaws at the time of adoption of the 2019 Resolution.[35] Lesko stipulated that the limit of

---

[33] *In re Villas of Windmill Point II Prop. Owners Ass'n, Inc.*, Case No. 19-20400, 2021 WL 814118 (Bankr. S.D. Fla. Mar. 2, 2021) ("Indemnity Opinion").

[34] The Indemnity Opinion provides additional analysis and context equally applicable to this Opinion.

[35] ECF No. 101, p.14, ¶¶ 63-65.

permissible debt under the Bylaws was $640,800 as of March 2019, and Debtor already had exceeded $640,800 of debt by that date.[36] The Bylaws therefore specifically prohibited the Debtor from taking on any further debt.[37] As a result, the Severance Claim awarded by the Board of Directors pursuant to the 2019 Resolution was invalid because it purported to create more debt in violation of the Bylaws.

Second, the retention of Lesko via Lesko Consulting was the very definition of a self-interested action. Lesko signed the Consulting Agreement as both an officer of Lesko Consulting and an officer of Debtor.[38] That trend continued with the Addendum and again with the 2019 Resolution. Lesko has not provided the Court with record evidence showing that a requisite number of disinterested directors approved of Lesko Consulting's initial engagement, his claim to "bonuses" for his services, or severance pay from his role as a "volunteer" director.

A minor point—but one worth noting—is that the dictionary definition of "volunteer"[39] implies that no payment would be tendered for Lesko's services as a director. If Lesko was truly a volunteer, then no severance would need to be paid when he relinquished his role as a director.

Third, the Court observes that the adoption of the 2019 Resolution was not in accordance with Debtor's Bylaws or applicable state law. This leads us to the most

---

[36] *Id.*

[37] See Bylaws Art. VI, § 4 (Case No. 19-20400, ECF No. 332-2, p. 6).

[38] ECF No. 61-4, p. 29.

[39] See, e.g., https://dictionary.cambridge.org/us/dictionary/english/volunteer.

important reason why the Severance Claim must fail: it is premised upon acts that violated Lesko's fiduciary duties as a director.[40]

Florida Statutes § 720.303(1) provides that "[t]he officers and directors of an association have a fiduciary relationship to the members who are served by the association." Neither the Consulting Agreement nor the 2019 Resolution relieved Lesko and the other directors from this statutory duty. The Bylaws also required Lesko and other directors, as agents of Debtor, to take actions that "promote[d] the common benefit and enjoyment of the residents".[41] And, to ensure that officers and directors do not neglect or fail to appreciate the importance of their role as fiduciaries, Florida Statutes § 720.3033(1)(a) requires directors to complete a written certificate attesting that a director will "faithfully discharge his or her fiduciary responsibility to the association's members." Although Lesko has never presented the Court with a copy of this certificate, the Court will assume *arguendo* that it exists because Florida Statutes specifically mandate that it exist.

Florida Statutes and the Bylaws impose restrictions upon the ability of officers and directors to act on behalf of Debtor. Those limitations include (i) proper notice of meetings, (ii) prohibitions against bribes and kickbacks, and (iii) special precautions

---

[40] To the extent that either Goldfarb or Storey participated in or aided Lesko's acts through their own actions or inactions, they are equally unable to claim compensation from Debtor.

[41] ECF No. 332-2 in Case No. 19-20400, p. 4 (Art. VI, § 1.q.). The Court takes judicial notice that this copy of the Bylaws is identical to a version filed in the Official Records of St. Lucie County. *See* File Number: 1657800, recorded August 24, 1998 at OR Book 1167, Pages 1103-21. Because the recorded version is barely legible, citations herein to Debtor's "Bylaws" are to the copy docketed in the Bankruptcy Case.

to be observed for transactions in which the officer or director is self-interested.[42] Lesko and the other directors deliberately flaunted these restrictions.

Directors, including Lesko, failed to give proper notice of meetings.[43] Those failures extended to notice of the meeting at which the directors purportedly approved the 2019 Resolution.[44] Members seeking appropriate disclosure of transactions involving Lesko were actively thwarted in their attempts to secure information.[45] Many (if not all) resident members were unable to voice potential opposition to the 2019 Resolution.

Failure to provide adequate notice is but one reason why the Severance Claim is invalid. The manner in which notice was provided and intentional hurdles thrown in the path of resident members who indicated an intent to oppose the actions of the board of directors show that the benefits accruing to Lesko and other directors from those transactions were little more than a raid of the HOA's proverbial piggy bank.

Fourth, the timing of adoption of the 2019 Resolution on March 1, 2019 strongly indicates bad faith. At the time of its adoption, the receivership action ("Receivership Action") had been pending in the State Court for over two years. The State Court entered a judicial default ("Default Judgment") on December 21, 2018,

---

[42] Fla. Stat. § 720.3033(3) & (12); Fla. Stat. § 720.306; Bylaws, Art. VI, X, XI, XIII, & XVII. *C.f. In re Toy King Distributors, Inc.*,  256 B.R. 1, 173 (Bankr. N.D. Fla. 2000) (describing duties of good faith and fair dealing).

[43] ECF No. 105-3, p. 2-4.

[44] *Id.*

[45] Id.

citing numerous willful discovery violations by Debtor.[46] It could not have been lost on Lesko and the other directors by March 2019 that their domination over the HOA was about to be lost.  Entry of the Receivership Order on August 2, 2019 wresting control away from the directors coincided with the Petition Date, a point not lost upon this Court. Had Trustee not been appointed pursuant to this Court's August 21, 2019 order, it is possible that Debtor's directors might have further plundered Debtor's coffers during the early days of the Bankruptcy Case.

The list of reasons enumerated above cannot possibly address every aspect in which Lesko and his fellow directors violated the Bylaws. The bloated state of the record makes pinpointing each violation extraordinarily difficult. That being said, the Court will list a few other significant observations: (i) the purported "vote" count for approval of the 2019 Resolution included units held by the association upon which directors held (invalid) mortgages, (ii) viewing the record as a whole, the only plausible explanation for the directors' approval of the 2019 Resolution was the "kickback" of mortgages for voting directors, and (iii) several members testified that they turned down bribes (or what those members perceived as bribes) from Lesko and other directors in exchange for member votes.[47]

Based upon all of these findings, the Court concludes that the 2019 Resolution was invalid.  The Severance Claim is thus invalid and must be valued at zero. And,

---

[46] ECF No. 44, p. 98, ¶ 19 ("Although the depositions were court-ordered and noticed by Plaintiff's attorney, HOA President Thomas Lesko testified that he unilaterally and willfully instructed one of Defendant's attorneys to 'cancel' the October 31, 2017 depositions of the three directors, hence the reason for their non-appearance.")

[47] ECF No. 105-5, p. 5, ¶ 23.

having made this determination, the Court further determines that each of the mortgage liens allegedly created by the 2019 Resolution and purportedly held by Lesko (or any of the other directors) (collectively, the "2019 Mortgages") is a legal nullity, and none of the liens arising from the 2019 Mortgages attach to the proceeds of the Sale.[48]

For these reasons, Trustee's objection to the Severance Claim is sustained.

D. Delinquency Claim

The Delinquency Claim is an offshoot of the Bonus Claim and Severance Claim. The Court's determination that the Bonus Claim and Severance Claim are invalid means that there is no Delinquency Claim. Accordingly, the Delinquency Claim fails as a matter of law, and Trustee's objection to the Delinquency Claim is sustained.

E. Kingdom Trust

The record reflects that Kingdom Trust is an investment vehicle for Lesko. Kingdom Trust did not file a separate proof of claim. Because the Lesko Claim is invalid, any derivative claim potentially assertible by Kingdom Trust is likewise invalid.

---

[48] The Court need not address title issues relating to these invalid mortgages because entry of the Sale Order effectively wiped out each of the 2019 Mortgages, and transferred the liens evidenced by the 2019 Mortgages to the proceeds of sale, subject to the Court's determination of the validity of the debt secured by such liens. Sale Order, at pp. 9-10, ¶F.

## II.    Count VII – Constructive Fraudulent Transfer

The Lesko Claim is wholly invalid for the reasons already described in detail above. There is no reason for the Court to delve into further analysis of additional bases that might prevent Lesko from asserting a claim against Debtor's estate. For this reason, the Court declines to award summary judgment as to Count VII.

Before concluding, however, the Court will note that the bloated and sometimes incoherent status of the record makes it extraordinarily difficult to ascertain (i) precisely which transfers to Lesko by Debtor were allegedly fraudulent, and (ii) the factual circumstances surrounding each of those transfers. As a result, summary judgment on Count VII would be inappropriate in any instance.

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1.    Trustee's Motion (ECF No. 59) is granted in part and denied in part, as more fully set forth below.

2.    Trustee's objection to the Lesko Claim is SUSTAINED.

3.    The Court GRANTS summary judgment in favor of Trustee as to Count I of the Amended Complaint against Lesko and Kingdom Trust.

4.    The Court DENIES summary judgment as to Count VII of the Amended Complaint.

5.    The Court retains jurisdiction over the implementation and interpretation of this Order pending resolution of this Adversary Proceeding.

###

Copy to:

21

Eyal Berger, Esq.

*Attorney Berger is directed to serve a copy of this order upon all interested parties and file a conforming certificate of service.*